TATE, Judge.
The plaintiff employer was insured by an “employee dishonesty” coverage issued by the defendant. The policy insured losses sustained “through any fraudulent or dishonest act or acts committed by any of the employees” of the plaintiff-insured. The plaintiff seeks recovery of certain sums allegedly embezzled.
The trial court dismissed the suit, holding that the plaintiff had failed to prove that any losses or shortages of funds resulted from employee dishonesty.
In his appeal, the plaintiff-appellant primarily urges that he had established with sufficient certainty that employee dishonesty had caused losses: (a) of a cash shortage as reflected by an audit; (b) of cash items withdrawn by the employee-manager for his personal use but shown in the records as paid out for business expenses.

a. Cash shortage.

In 1957 the plaintiff purchased a cleaning business having a gross annual volume of over one hundred thouand dollars (although the records further indicate that this business was declining annually even under the previous owner). During the plaintiff’s ownership from 1957-1962, the volume of business declined substantially, as shown by the records both of the annual gross income and of the annual expenses.
The annual audit of December 31, 1959, disclosed that there was a “cash shortage” of $3748.84. As the accountant explained, however, this accounting summary may indeed have represented a shortage due to employee dishonesty or otherwise, but it also may have resulted from bookkeeping and other errors due to the loose manner in which the financial transactions of the business were carried out. Another accounting witness testified to the same effect.
The receipts of the business, mostly in small cash sums or checks, were deposited into a cash register by six or seven people, including the owner himself as well as two or three front employees and also several route delivery drivers.
Likewise, approximately eighty per cent of the expenses of the, business was paid out in cash from this register, including most of the employees’ wages. (For example, during a representative period some forty-four thousand dollars was paid out in cash from the register, out of the total for the period of some fifty-two thousand dollars in business expenses; only the remaining eight thousand dollars in expenses being paid by check.) On paying out sums from the register, the person doing so was supposed to make a handwritten notation on a cash register tape in order to explain the disbursement.
Checks were made out to “cash” by the owner or the manager and withdrawn from the checking account, in order to maintain a cash balance in the cash register to pay these expenses. For example, during a three-year period some $38,000 in checks was made out to cash, many of them by the plaintiff-owner himself — some of them for his own personal use, but the others for business use, which were supposedly then re-deposited into the cash register. If, for instance, inadvertently a personal withdrawal of the owner was not correctly designated as such, under the bookkeeping mechanism of the business such withdrawal was nevertheless automatically credited to the cash supposedly on hand in the cash register.
No evidence was produced which showed that any cash sums supposed to be deposited in the cash register were not, in fact, so deposited, nor was there any evidence proving that any sums deposited in the cash register were actually withdrawn without the correct purpose being shown. For the reasons detailed by the trial court, which *364 we need not reiterate here, the testimony of the plaintiff’s expert accountant did not furnish proof of any such loss, based as it was upon the owner’s unsubstantiated estimates of what should have been the amount of cash withdrawals from the bank for deposit in the cash register, and upon his unsubstantiated estimates of what certain types of expenses should have amounted to.
The accuracy of the record of the in-going and out-going cash transactions depended upon the accuracy (or forgetfulness or even intentional falsification) as to the handwritten notations made by some five or six employees with access to the cash register, as well as for that matter by the plaintiff-owner himself.
Under these circumstances, there is considerable question whether the bookkeeping “cash shortage” item in question actually resulted from a loss in funds rather than from bookkeeping errors or failures due to the inadequacy of the bookkeeping system. Further, “while every act of embezzlement involves a shortage, every shortage does not involve an act of embezzlement.” Curran & Treadaway v. American Bonding Company, 193 La. 763, 192 So. 335.
The burden of proving that any cash shortage or loss was due to employee fraud or dishonesty, so as to justify recovery under insurance coverages similar to the present, is upon the employer-insured; and when, as here, the evidence shows that the losses or shortages may reasonably have been due to other causes, recovery under the policy should be denied. Riggs v. American Surety Co., 217 La. 406, 46 So.2d 313; Service Enterprise, Inc. v. National Surety Corp., La.App. 3 Cir., 149 So.2d 149.
We therefore find no error in the trial court’s holding that the plaintiff had not proved by a preponderance of the evidence that the “cash shortage”, if any, did indeed result from employee fraud or dishonesty within the coverage of the defendant’s policy.

b. Cash withdrawals by manager for personal use.

This claim by the plaintiff-employer results from the circumstance that the employee-manager admittedly withdrew in cash each week a total of $25, usually charged off by him as $10 to “porter” and as $15 to “adjustment” (i. e., for damages to the clothes of customers), respectively. However, the sums so withdrawn were retained by the manager for his own personal use.
This employee-manager, F. H., had been employed by the previous owner since 1935. F. H. testified that, in addition to his salary, he had been allowed an “expense account” by his previous employer, which the present plaintiff-employer, upon his purchase of the business in 1957, had specifically agreed to continue in the amount of $25 in cash weekly, to be debited to certain expense items, as was done. (The apparent purpose of this was to allow this additional compensation for social expenses of the manager in aid of the business, but at the same time to simplify the manager’s reporting of this compensation for personal tax purposes.)
Although the plaintiff denied that he had made this agreement or that he had ever previously noticed these weekly cash disbursements (which were regularly noted on the cash register tape), we find no error in the acceptance by the trial court instead of the testimony of F. H. concerning such agreement. F. H.’s version is to some extent corroborated by another employee, who (although testifying on behalf of the plaintiff) admitted that these withdrawals were openly done and a matter of common knowledge among the other employees and believed to be with the consent of the employer, and who testified as to a somewhat similar additional compensation arrangement which he himself had with the plaintiff-employer. In addition, this latter employee did not deny (Tr. 120) that on one occasion he had informed investigators of overhearing a discussion between F. H. and *365 the plaintiff-employer concerning a payment of extra compensation in cash each week to F. H. in addition to his regular salary.
The trial court therefore properly denied recovery for this item, since, under its evaluation of the testimony, these weekly cash withdrawals by F. H. were made with the knowledge and consent of the plaintiff-employer and did not result from any fraudulent or dishonest act by the employee so as to be within the “employee dishonesty” coverage of the policy issued by the defendant insurer.

Decree.

For the foregoing reasons, we affirm the judgment of the trial court dismissing the plaintiff-appellant’s suit, at the cost of the said appellant.
Affirmed.